

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1949 | **DATE** | 3/25/2003 |
| **CASE TITLE** | Johnson vs. Norfolk S Corp | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ___ _.

(3) ☐ Answer brief to motion due_ ___. Reply to answer brief due_ ___.

(4) ☐ Ruling/Hearing on ___ set for _____ at ___ _.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on ___ _ set for _____ . at ___ _.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on ___ __ at __ ____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ___ ___ at __ ____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Norfolk Southern Corporation's motion for summary judgment is granted [18-1] for the reasons set forth in the attached Memorandum Opinion and Order. Johnson's motion for leave to file supplemental exhibit tab 6 [26-1] is granted.  Johnson's motion to strike certain paragraphs of the supplemental declaration of Dr. Lina [28-1] is denied. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 2 6 2003 | |
| | Docketing to mail notices. | | date docketed | 31 |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 3/25/2003 | |
| | | 03 MAR 25 PM 4:57 | date mailed notice | |
| cav | courtroom deputy's initials | FILED | cav | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| EARL L. JOHNSON, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     **Case No. 01 C 1949** |
| | ) |
| NORFOLK SOUTHERN CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

NAN R. NOLAN, Magistrate Judge:

Plaintiff Earl L. Johnson, Jr. filed a complaint against defendant Norfolk Southern Corporation ("NSC") alleging that he was held out of service without pay for two and a half months in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 *et seq.*, and Title VII of the Civil Rights Act, 42 U.S.C. §2000e *et seq.* The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This matter is now before the Court on NSC's motion for summary judgment. For the reasons set forth below, the motion is granted.

## FACTUAL BACKGROUND

NSC is a holding company headquartered in Norfolk, Virginia. NSC's subsidiary, Norfolk Southern Railway Company ("NSR"), is a Virginia railroad company that does business in Illinois as an interstate common carrier of freight. NSC provides management services for NSR, including medical management services through NSC's Medical Department. Johnson

was hired by a predecessor to NSR in October 1988 as a switchman. Shortly thereafter, he became qualified as a locomotive engineer and has worked for NSR in this capacity ever since.

On February 16, 2000, Johnson went to see his personal physician at the Union Health Service in Chicago because of pain in his knee. This was the first time he had ever consulted with a doctor regarding a knee problem. Johnson's doctor did not prescribe any medication or recommend that Johnson take time off from work. On April 3, 2000, Johnson returned to Union Health Service complaining of a further flare-up with his knee. Johnson told the doctor that his right knee was painful, that he could not fully straighten the leg, and that he was having difficulty walking because of the pain. Johnson also stated that the symptoms had become much worse during the previous two weeks. The doctor x-rayed Johnson's leg, recommended that he take three days off work, and prescribed Tylenol for the pain. Johnson marked off work for the three days recommended by his doctor and for an additional four vacation days.

On April 7, 2000, Johnson tried to return to work but was instructed by Trainmaster Peters that he first needed to obtain a release from his doctor. Johnson returned to his doctor that day and reported that his knee was extremely painful. He stated that he had been experiencing pain off and on for about five weeks, and that he could not straighten his leg all the way. In addition, Johnson was using a cane. The doctor observed Johnson "limp around the room a few times" and step on and off a stool, which Johnson says he "negotiated without any problem other than limping and pain." The doctor asked Johnson what his job duties were as a locomotive engineer, and Johnson responded that he "sit[s] down on my rump and out rig[s] a locomotive all day." Johnson Dep., pp. 87-88. At the end of the examination, the doctor released Johnson to return to work on April 9, 2000 without restrictions.

2

Johnson returned to work for his next scheduled shift on the evening of April 9. He gave the doctor's note to Trainmaster John Gentry and went to work. The following morning on April 10, 2000, Assistant Superintendent Richard Zimmerman contacted the NSC Medical Department and spoke with Occupational Health Nurse Beverly Dozier. Zimmerman told Nurse Dozier that Johnson had been observed limping and having problems walking, and that Zimmerman was concerned about Johnson's ability to safely mount and dismount locomotives. The parties have not identified the individual who reportedly observed Johnson having problems walking, but Johnson admits that he was in fact limping and in pain at that time. Johnson Dep., pp. 232-33. Nurse Dozier told Zimmerman that Johnson should be scheduled for a fitness for service examination with a company doctor because a locomotive engineer has to walk on uneven terrain and ballast, and has to climb ladders to get up to the cab of the locomotive. Zimmerman interpreted Nurse Dozier's instruction to mean that Johnson could not work until he completed the fitness for service examination and held Johnson out of service pending that examination. Although this was not the normal procedure, Nurse Dozier testified that periodically, a supervisor will instruct an employee not to return to work until released by a doctor.

Trainmaster Peters called Johnson at home on April 10, 2000 and told him that he needed to see a company doctor to evaluate his medical condition and that he would be held out of service pending that evaluation. Johnson went to the Hammond Clinic on April 12, 2000 for his scheduled appointment and was examined by one of the staff physicians. Johnson told the doctor that his knee had flared up and started hurting in connection with exercise. The doctor examined Johnson and signed an NSR form stating that Johnson could perform the essential functions of a locomotive engineer. Johnson took the release to NSR and returned to work on April 12 or 13,

3

2000. At that time, his knee pain had diminished and his condition was improved. Def. Facts ¶20.

On April 14, 2000, Johnson went to see his personal physician, Dr. Pahwa, at the Union Health Service, and reported that he still could not straighten his knee. Dr. Pahwa, an orthopedist, recommended that Johnson have an MRI done on the knee and prescribed an anti-inflammatory drug, Indocin. On April 18, 2000, Johnson had an MRI. Shortly thereafter on April 26, 2000, Johnson went to see Superintendent of Terminals Burl Scott about being paid for the days he was held out of service between April 10 and 12. Johnson had filed a time claim for those days under his collective bargaining agreement but Scott had decided that NSR would not pay any of the claims. During that conversation, Scott noticed for the first time that Johnson had a severe limp and was in obvious pain. Scott shared his observation with Johnson who explained that his knee was hurting due to an arthritic flare-up. Scott expressed concern that Johnson might injure himself on the job, which required him to walk on uneven ground, rock ballast, rail ties and rails, and to mount and dismount locomotives using ladders. Johnson said that he had been performing his job safely since April 12 and offered to complete a field test to show his ability to perform his essential job functions.

Scott declined Johnson's offer and took him out of service citing safety concerns. Scott told Johnson that he would contact the NSC Medical Department, which he did later that day. Specifically, Scott called the NSC Medical Director, C. Ray Prible, M.D., and told him that Johnson had completed a fitness for service examination a couple of weeks earlier and had been released to return to work, but that he was now limping around the yard in apparent pain. Scott told Dr. Prible that Johnson admitted that he was hurting, and Scott recommended taking

4

Johnson out of service because he was a falling risk out in the yard. Dr. Prible said that he would investigate the matter and agreed that Johnson should be placed on a "medical hold" to protect his safety pending an evaluation. A "medical hold" is a temporary removal from active service pending a determination of an employee's fitness for service. Only the NSC Medical Department can place an employee on medical hold. However, a supervisor who has concerns about an employee's fitness for service is expected to contact the NSC Medical Department for advice, and an employee may be placed on medical hold based on a supervisor's reported observations.

After speaking with Dr. Prible on April 26, 2000, Scott sent him an e-mail message, copied to Dr. Paula Lina, stating:

> This man has a severe problem with his knee. He limps real bad and admitts (sic) he is in a lot of pain. He says he has a bad "arthris" (sic) condition, this no doubt is magnified" by his weight. Personal observation of about 300 pounds, 5'11" tall.
>
> He was off recently and brought release from personal doctor, sent to Hammond clinic released for work????With a bad limp.
>
> He was told to send in medical to you on this before and he was off over a month with the same condition.
> He was told he cannot work until he provides complete medical from his doctor to you.

Johnson Dep. Ex. 13. Johnson notes that the e-mail message inaccurately states that he was off work for one month for his knee condition, and fails to reveal that he obtained a doctor's release because Zimmerman took him out of service. In any event, Dr. Prible referred the matter to Dr. Lina and Nurse Dozier.

At Dr. Lina's request, Nurse Dozier looked into the matter and reported that Johnson's supervisor – presumably Scott – had observed Johnson walking with a severe limp. She also

5

relayed that Johnson had told Scott that he was experiencing a lot of pain in his knee. Based on this information, Dr. Lina recommended that Nurse Dozier place Johnson on medical hold pending further evaluation of his fitness for service. Dr. Lina knew that Johnson had successfully completed a fitness for service evaluation on April 12, 2000, but she determined that further evaluation was necessary because Scott's personal observations of Johnson on April 26 gave her a reasonable belief that Johnson's condition might have changed and was now impairing his ability to perform his job. Dr. Lina felt that it was most appropriate to obtain information from Johnson's treating physician rather than relying on a field test because his physician could clarify Johnson's condition and history of treatment, as well as their effect on his ability to work.

On April 27, 2000, Nurse Dozier sent Zimmerman an e-mail message instructing him to place Johnson on medical hold and to inform Johnson that his doctor needed to provide the NSC Medical Department with information about his current condition, including any recommendations as to the need for work restrictions or accommodations. Scott called Johnson that day to request the information and confirmed the conversation by letter dated April 28, 2000. Also on April 28, Johnson returned to Union Health Service for a previously scheduled appointment with Dr. Pahwa to review the results of his MRI. Johnson was walking with a cane and complained to Dr. Pahwa that he continued to have knee pain. He also told the doctor that he was off work. Dr. Pahwa gave Johnson a new prescription for Indocin and told him to begin physical therapy on his knee. At Johnson's request, Dr. Pahwa signed a note stating that Johnson was "physically able to return to work as of 4/28/00." NSC points out that the doctor did not express an opinion as to Johnson's ability to perform the specific job duties of a locomotive

6

engineer. Johnson claims that Dr. Pahwa knew he was an engineer; however, he presents no evidence that Dr. Pahwa knew his specific job duties aside from the description Johnson gave him on April 7, 2000 – *i.e.*, that he "sit[s] down on my rump and out rig[s] a locomotive all day." Johnson Dep., pp. 87-88; Pl. Facts ¶40.

On April 29, 2000, Johnson received Scott's letter requesting medical records. Johnson called Union Health Service to ask for the records and was informed that he needed to come in, sign a release and pay a fee. Johnson complied with these instructions and was told that he would be notified when the records were ready for pick-up. Early the next week, Johnson went to Scott's office with his April 28 work release and asked if he could return to work. Scott told him that he could not return until the NSC Medical Department cleared him for work, which it could not do until it received his medical records. Johnson understood that the decision to remove him from medical hold had to be made by the Medical Department.

Johnson started physical therapy on May 3, 2000. Shortly thereafter, he picked up his medical records and asked that the Superintendent's office forward them to the NSC Medical Department. The records were faxed as requested on May 9, 2000. Dr. Lina reviewed the records and determined that she did not have sufficient information to assess Johnson's fitness for service. The records indicated that Johnson was experiencing ongoing symptoms with his knee and needed a cane to walk. He had a reduced range of motion in his knee and was prescribed stronger medication and physical therapy. Dr. Lina remained concerned that Johnson's knee condition represented a significant safety risk and would impair his ability to climb and walk on uneven terrain, especially because he was using a cane. She was also concerned that Johnson's doctor did not have a full understanding of Johnson's job duties given

that he was given a full release to work even though he was walking with a cane. Accordingly, Dr. Lina faxed a letter to Dr. Pahwa on May 10, 2000 requesting that he provide additional information on Johnson's condition in light of his specific job duties, which she described in the letter. The following day, Dr. Lina received a fax from the Union Health Service stating that Johnson had an appointment scheduled with Dr. Pahwa on June 9, 2000, which he "must keep per Dr."

By June 1, 2000, Dr. Lina still had not received the information she requested on May 10. Thus, she sent an e-mail message to Scott asking him to contact Johnson and advise him that they were still waiting for some information from his doctor. On June 5, 2000, Superintendent D.C. Talley sent a letter to Johnson instructing him to provide the NSC Medical Department with all relevant medical records and a current work release from his physician. Johnson was examined by Dr. Loughran at the Union Health Service on June 9, 2000 and reported that he had attended physical therapy and was feeling better. Dr. Loughran told Johnson that he could work without restrictions and that no further treatment was necessary. He gave Johnson a prescription for Vioxx, another anti-inflammatory drug, and signed a note stating that Johnson was "fully released without restrictions as he was on April 28, 2000. He is able to work as of June 9, 2000."

Johnson mailed the June 9, 2000 work release and supporting records to the NSC Medical Department, but Dr. Lina did not receive them until June 21, 2000. After reviewing the records, Dr. Lina determined that they still did not address the concerns expressed in her May 10 letter. On June 22, she called the Union Health Service and tried to speak with Johnson's doctor but he was not available until Friday. Dr. Lina sent Scott an e-mail message updating him on the situation and stating that Johnson was to remain on medical hold until she had a chance to talk

8

with his physician. On Friday, June 23, Dr. Lina spoke with Dr. Pahwa and confirmed that Johnson's knee pain had improved and that he was able to safely perform the specific functions of a locomotive engineer. Based on this information, Dr. Lina determined that Johnson could work without any accommodations and sent an e-mail message to Scott instructing him to schedule Johnson for a standard return to work examination that is required of all employees who are off work for more than 30 days. Johnson had a return to work examination on June 29, 2000. The physician at MacNeal Medical Center found that Johnson was able to perform the essential functions of his job and mailed these results to NSR. Scott then contacted Johnson to schedule a standard back-to-work conference to review any changes or updates in the terminal since his absence. Johnson returned to work on July 12, 2000, after taking a one-week vacation. He has two time claims pending for payment during the time he was off work on medical hold, both of which were denied. They remain pending under the procedures established in the collective bargaining agreement.

On May 30, 2000, Johnson filed a timely charge of disabilities discrimination with the Illinois Department of Human Rights and the EEOC. He filed a second EEOC charge on January 19, 2000 alleging race discrimination. On March 20, 2001, Johnson timely filed this lawsuit. He initially alleged race discrimination in the areas of hiring, promotional and seniority systems, wages, layoffs, recalls, job assignments, and other terms and conditions of employment, but is no longer pursuing these claims. Johnson's additional allegations of race and disability discrimination in connection with his placement on medical hold in 2000 remain pending before this Court, and NSC now seeks summary judgment on these claims.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, we view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). This standard is applied with special scrutiny to employment discrimination cases, which often turn on issues of intent and credibility that are best reserved for a jury. *See Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000); *Robinson v. PPG Industries, Inc.*, 23 F.3d 1159, 1162 (7th Cir. 1994).

### A.     Johnson's ADA Claims

To establish a claim of disability discrimination under the ADA, Johnson must first prove that he is disabled within the meaning of the Act and that he is qualified to perform the essential functions of the job either with or without reasonable accommodation. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001); *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950 (7th Cir. 2000). Disability is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §§12102(2); *Hoffman*, 256 F.3d at 572. If Johnson makes this threshold showing, he must then establish discrimination either by presenting evidence of disparate treatment or by showing a failure to accommodate. *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021-22 (7th Cir. 1997). In this case, Johnson is pursuing both types of claims.

10

## 1.     Disparate Treatment

Johnson does not claim to have direct evidence of discrimination, so he must proceed under the familiar burden-shifting analysis set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Johnson must first establish a prima facie case of discrimination by showing that: (1) his is disabled within the meaning of the Act; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees received more favorable treatment. *Hoffman*, 256 F.3d at 572. If NSC articulates a legitimate, non-discriminatory explanation for its actions, then the burden shifts back to Johnson to prove that the explanation is a pretext for intentional discrimination. At all times, the ultimate burden of persuasion remains with Johnson. *Nawrot v. CPC International*, 277 F.3d 896, 905-906 (7th Cir. 2002).

### a.     Prima Facie Case

NSC argues that Johnson cannot establish a prima facie case of disability discrimination because he is not disabled within the meaning of the Act and cannot identify any similarly situated employees who were treated more favorably than him. Johnson claims that he suffers from an actual disability – osteoarthritis in his right knee – or, alternatively, a perceived disability, and that seven comparable employees received better treatment. The Court considers each argument in turn.

#### i.     Actual Disability

To establish discrimination on the basis of an actual disability, Johnson must first show that he has an impairment that substantially limits one or more of his major life activities. 42 U.S.C. §12102(2); *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 195

(2002). Johnson claims that the osteoarthritis in his right knee constitutes such a substantially limiting impairment with respect to the major life activity of walking. In determining whether an impairment is substantially limiting, courts consider: "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." 29 C.F.R. §§1630.2(j)(2)(i)-(iii); *Toyota Motor Manufacturing*, 534 U.S. at 196. "Intermittent, episodic impairments are not disabilities." *Heimann v. Roadway Express, Inc.*, 228 F. Supp. 2d 886, 900-901 (N.D. Ill. 2002) (quoting *Vande Zande v. State of Wisconsin Department of Administration*, 44 F.3d 538, 544 (7th Cir. 1995)).

In *Moore v. J.B. Hunt Transport, Inc.*, the plaintiff suffered from rheumatoid arthritis. The court determined that this condition did not substantially limit the plaintiff's ability to walk because he could walk distances of less than a mile "consistently" and one mile without problem. In fact, his arthritis affected more the "rate and pace" of his activities as opposed to his ability to perform them. 221 F.3d at 951. The plaintiff's temporary arthritic flare-ups similarly did not render him substantially limited in the major life activity of walking because they only occurred once or twice per year. *Id.* at 952.

Like the plaintiff in *Moore*, Johnson has presented no evidence that his osteoarthritis is a substantially limiting impairment. For several months prior to February 2000, Johnson experienced a deterioration in his knee resulting in an inability to walk as quickly as normal. Throughout that time, however, he was able to walk, climb stairs, work and even give boxing lessons. On February 16, 2000, Johnson consulted a physician regarding his knee pain – his first visit to the doctor for that condition. Between February 16 and June, 2000, Johnson experienced

arthritic flare-ups that caused him to limp and, at times, walk with a cane. However, his condition mostly affected the rate and pace of his walking, and by June 2000 his condition had stabilized. He still could not walk as fast or as long as he had prior to the flare-up, but he could stand continuously and walk for 15 or 20 minutes at a time with two or three minutes of rest in between. Johnson's only other reported limitation was an inability to spar with the boxers he trains. Johnson Dep., pp. 174-77. Since June 2000, Johnson has not received any further medical treatment for his knee and has only missed a few days of work due to knee pain. Def. Facts ¶62.

Johnson's condition is not the type of substantially limiting impairment contemplated by the ADA. The Act simply does not protect individuals with impairments that interfere in only a minor and temporary way with their ability to walk. *See Toyota Motor Manufacturing*, 534 U.S. at 196-98 (plaintiff not substantially impaired unless his arthritis "prevents or severely restricts" him from walking, in a permanent or long-term way); *Battle v. Power Logistics*, No. 99 C 5872, 2000 WL 1671505, at *5 (N.D. Ill. Nov. 3, 2000) (citing 29 C.F.R. pt. 1630 app., §1630.2(j)) ("temporary, non-chronic impairments of short duration with little or no long term or permanent impact, are usually not disabilities"). Indeed, Johnson himself barely pursues this argument. Pl. Mem., p. 2. Thus, Johnson cannot establish an ADA claim based on an actual disability.

### ii. Perceived Disability

Johnson's primary argument on the issue of disability is that NSC regarded him as being disabled. 42 U.S.C. §12102(2)(C). The "regarded as" provisions of the ADA are designed to "combat the effects of archaic attitudes and erroneous perceptions that employers may harbor about impairments that are not, in and of themselves, substantially limiting." *Klaus v. Builders*

13

*Concrete Co.*, No. 00 C 7757, 2002 WL 193417, at *8 (N.D. Ill. Feb. 7, 2002) (citing *Vande Zande*, 44 F.3d at 541). To establish a disability under §12102(2)(C), Johnson must show that NSC mistakenly believed that his nonlimiting impairment substantially limits one or more major life activities. *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 521-22 (1999). "It is not enough for [Johnson] to show that [NSC] was aware of [his] impairment; instead [Johnson] must show that [NSC] knew of the impairment and believed that [he] was substantially limited because of it." *Moore*, 221 F.3d at 954 (quoting *Skorup v. Modern Door Corp.*, 153 F.3d 512, 515 (7th Cir. 1998)).

Johnson argues that Zimmerman and Scott regarded him as disabled because they pulled him out of service to undergo medical examinations. However, Johnson has not refuted the record evidence that NSC was merely trying to ascertain the extent of Johnson's impairment and ensure that he could safely perform his duties. On April 10, 2000, Zimmerman received an accurate report that Johnson was limping and having trouble walking, which Zimmerman deemed a potential safety risk given that Johnson needed to walk on uneven terrain and climb ladders to get up to the locomotive cabs. It may have been somewhat unorthodox for Zimmerman to take Johnson off work pending a fitness for duty examination, but supervisors have occasionally done so and Zimmerman explained that he thought he was following Nurse Dozier's instructions on this issue.

When Scott consulted Dr. Prible about Johnson's condition on April 26, 2000, it was similarly based on his personal observation that Johnson was limping and in obvious pain – facts Johnson admits – and his concern that Johnson was a falling risk out in the yard. Indeed, two days later when Johnson went to see his doctor to review the results of his April 18, 2000 MRI,

14

he was walking with a cane. *See, e.g., Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir.

2000) ("[i]t was entirely reasonable, and even responsible, for CPD to evaluate Krocka's fitness

for duty once it learned that he was experiencing difficulties with his mental health"). And as

soon as the medical department cleared Johnson for work, he was back on the job where he

remains today without any interference or objection from Zimmerman or Scott. At most, the

evidence demonstrates that Zimmerman and Scott regarded Johnson as "impaired" or

"restricted," not "disabled." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001) (an

employer can regard an individual as "impaired" or "restricted" without necessarily regarding

him as "disabled").

Johnson finds it significant that he was forced to complete several medical evaluations

over a short period of time and was cleared to work by all examining physicians. However, he

has not demonstrated that any of the examinations were requested inappropriately, much less

based on a perception that he was disabled as opposed to impaired. As noted, Zimmerman and

Scott requested advice from the medical department because they had current information that

Johnson was in obvious pain and having trouble walking notwithstanding any earlier medical

releases. Both expressed concern specifically about Johnson's ability to walk in a rail yard and

climb onto locomotives.

As for the NSC Medical Department's requests for information, Dr. Lina knew that

Johnson had successfully completed a fitness for service evaluation on April 12, 2000. She

nonetheless recommended that Nurse Dozier place Johnson on medical hold because Scott's

personal observations of him on April 26 gave her a reasonable belief that his condition might

have changed and was now impairing his ability to perform his job. Indeed, Johnson admits that

15

at least a week earlier, he had stopped taking the anti-inflammatory medication prescribed on April 14 because it made him dizzy and drowsy. Johnson Dep., pp. 133-34. When Johnson's physician signed a note releasing him to work two days later, he failed to express an opinion as to Dr. Lina's particular concerns regarding Johnson's ability to perform his specific job duties, such as climbing ladders and walking on uneven terrain. Dr. Lina requested additional information from Johnson's physicians in May 2000 because his medical records did not address her concerns about Johnson's ability to work safely. In addition, she was concerned that Johnson's doctor did not have a full understanding of Johnson's job duties given that he released Johnson to work while he was walking with a cane. Most significantly, once Dr. Lina spoke with Johnson's doctor and confirmed that he did not pose a safety risk on the job, Johnson was immediately taken off medical hold and reinstated to his locomotive engineer position after completing a standard return to work examination. And Johnson has continued in NSC's employment without further interruption for knee pain. *See, e.g., Feldman v. American Memorial Life Insurance Co.*, No. 96 C 3371, 1998 WL 102663, at \*5 (N.D. Ill. Mar. 3, 1998) ("[e]ven more convincing that Feldman was not regarded as disabled is the fact that Prairie requested that she return to work").

Johnson also relies on testimony from Scott and Zimmerman that Johnson "could not walk in the yard without hurting himself, he could not climb on and off the engine, he could not lift his legs over the rails when walking in the yard and both thought his weight added to his disability." Pl. Mem., p. 5. However, this merely indicates that Scott and Zimmerman thought Johnson was unable to perform his particular job functions, not that he was unable to work generally in a broad class of jobs. 29 C.F.R. §1630.2(j)(3)(i)) ("[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of

16

working"); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999) (employer did not regard individuals as disabled merely because vision problem precluded them from performing job functions of global airline pilot). And it certainly does not show that Scott and Zimmerman thought Johnson was substantially limited in his ability to walk in non-rail yard contexts.

Johnson makes much of the fact that Zimmerman used the word "disability" when testifying about Johnson's condition. But Zimmerman is not an attorney and his use of that legal term is not dispositive. Indeed, Johnson himself states that "Zimmerman felt that Mr. Johnson was unsafe *just around railroad equipment*," which in no way suggests that Zimmerman regarded Johnson as substantially limited in any major life activity. Pl. Mem., p. 5 (emphasis added). In sum, Johnson has not raised any genuine issues of fact as to whether Zimmerman, Scott or anyone else at NSC regarded him as disabled under the ADA.

### iii. Similarly Situated Employees

In addition to not being disabled within the meaning of the ADA, Johnson has submitted no evidence of any similarly situated employees who received more favorable treatment than him. Johnson compares himself to seven individuals – Michael Chand, Thomas Trotta, Donald Rahut, George Smith, Laurie Getz, Tim Hobbs and Matthew Lappin. Johnson claims that unlike him, Chand and Rahut were offered other positions while off work due to injury, and that Chand was allowed to work as an engineer even though his knee condition was "more debilitating and serious than plaintiff." Pl. Mem., p. 7. However, Johnson admits that Chand was offered another job only after it was determined that he could not perform the functions of his current position (which never happened to Johnson), and he submits no record citation or other admissible evidence to support his bald assertion that Chand's condition was worse than his. Pl.

17

Facts ¶75. *See Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001) (self-serving statements unsupported by the record are insufficient to defeat summary judgment); *Aguilera v. Village of Hazel Crest*, 234 F. Supp. 2d 840, 845-46 (N.D. Ill. 2002) (failure to provide precise record citation supporting denial of a Local Rule 56.1 statement of fact "will result in the court deeming a statement of fact as uncontested"). In addition, Johnson relies solely on inadmissible hearsay to establish that Rahut was offered other positions while he was off work. Pl. Facts ¶75; *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial").

Johnson claims that Trotta, Smith and Hobbs all had trouble walking and/or mounting and dismounting a locomotive but were allowed to continue working. But Johnson admits that he has no personal knowledge of the information provided to the NSC Medical Department regarding these men's medical conditions, or the bases for the Department's decisions to allow them to continue working. Def. Facts ¶75. In addition, he provides no record support for any of his factual assertions about these individuals. Pl. Facts ¶75. As for Getz, Johnson states that she "sought another position because she no longer wanted to be a transportation employee," and then asserts that he "could have become a clerk while on medical hold without giving up his seniority as an engineer." Pl. Mem., p. 7. Again, Johnson has not provided any admissible evidence to support such a claim. *Ozlowski*, 237 F.3d at 840; *Aguilera*, 234 F. Supp. 2d at 845-46.

There is some question as to whether Johnson timely disclosed Lappin as a comparative. Despite specific requests for the identity of all comparative employees, and despite the fact that Johnson's counsel appears to represent Lappin in a lawsuit against NSR, Johnson failed to

mention Lappin until responding to NSC's summary judgment motion. In any event, Lappin is not similarly situated to Johnson. As a preliminary matter, Lappin worked for NSR in Muncie, Indiana, not Chicago, and reported to different supervisors. *See, e.g., Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000) (employees under different supervisors were not similarly situated because supervisors may exercise their discretion differently). Nevertheless, Johnson makes much of the fact that (1) Lappin's supervisor, Trainmaster N. Terry Boehm, twice asked the NSC Medical Department to closely check Lappin before letting him return to work after he had back surgery, but (2) unlike the case with Johnson, the Medical Department did not request any additional medical information from Lappin's medical providers. Despite this seeming disparity, the two situations are not similar because unbeknownst to Boehm, the Medical Department had already evaluated Lappin and determined that he was fit for service. Boehm Dep., p. 40 ("I don't know what the Medical Department was doing or did"). After the Medical Department cleared Johnson for service in June 2000, they never evaluated him for a knee problem again either. Moreover, Johnson has not presented any evidence that Boehm or anyone else ever personally observed Lappin struggling to walk or exhibiting signs of pain after he tried to return to work. Johnson's supervisors, conversely, did observe such symptoms in Johnson, who admits that the observations were accurate.

Absent evidence that he is disabled within the meaning of the ADA and that similarly situated employees received better treatment than he did, Johnson cannot establish two elements of his prima facie case of disability discrimination. Thus, NSC is entitled to summary judgment on Johnson's disparate treatment claim.

19

### b.  Pretext

Having found that Johnson failed to set forth his prima facie case of discrimination, the Court need not consider the issue of pretext. *See, e.g., Blakely v. Brach & Brock Confections, Inc.*, 181 F. Supp. 2d 943, 946 (N.D. Ill. 2002) (declining to address pretext where plaintiff failed to establish prima facie case). However, summary judgment for NSC is appropriate on this basis as well. Pretext means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). Johnson may establish pretext directly with evidence that NSC was more likely than not motivated by a discriminatory reason, or indirectly by evidence that NSC's explanation is not credible. *See Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1039 (7th Cir. 1993). Under the indirect method, Johnson must show that NSC's proffered reasons are factually baseless, were not the actual motivation for the action, or were insufficient to motivate the action. He must also provide an inference that the real reason was discriminatory. *See Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999).

Other than his own self-serving denials and speculations, Johnson has not submitted any competent evidence that Zimmerman, Scott or anyone else at NSC recommended that he undergo medical examinations for any reason other than their concern about his ability to perform his job duties safely. Pl. Facts ¶¶18, 24, 25, 28-29, 32-36, 45, 57, 58. To that end, NSC immediately reinstated Johnson to his position as locomotive engineer as soon as it confirmed that he could work safely. Johnson attempts to argue that Scott wanted him placed on medical hold in April 2000 because in May 1999, Scott took Johnson out of service when Johnson told him that he could not safely fill in for someone on one hour's notice. But the evidence indicates that Trainmaster T.L. Reynolds, not Scott, thought Johnson should be taken out of service pending a

20

medical examination because Johnson told Reynolds that he was suffering from sleep deprivation and wanted a doctor to clear him for work. Lina Dep., Ex. 4. Moreover, even if Scott had made the recommendation in May 1999, there is no evidence that he acted with a discriminatory motive at that time, much less nearly a year later.

Johnson also points to misstatements in Scott's April 26, 2000 e-mail message to the NSC Medical Department expressing concern about Johnson's ability to work. Specifically, the message incorrectly stated that Johnson had been off work for one month for his knee condition. According to Johnson, "[s]ince Scott was actively involved in the sleep deprivation episode of May - June 1999 and that was the only time plaintiff was off for a month prior to April of 2000, one can only conclude that Scott purposely misinformed the medical department." Pl. Mem., p. 9. As noted, however, it was Reynolds and not Scott who was responsible for taking Johnson out of service in May 1999, apparently at Johnson's request to see a doctor to determine his fitness for service. Johnson's unsupported belief that Scott must have been trying to deceive the medical department is insufficient to establish pretext or any discriminatory animus on the part of Scott. *See Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999) ("plaintiff's speculation is not a sufficient defense to a summary judgment motion").

In sum, Johnson has not established that NSC intentionally discriminated against him because of a disability, and NSC is entitled to summary judgment on his disparate treatment claim. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993) (plaintiff bears the burden of proving intentional discrimination by the defendant).

## 2. Failure to Accommodate

An employer's duty to reasonably accommodate "an otherwise qualified individual with a disability" does not arise unless the individual actually has a disability. *Szmaj v. American Telephone & Telegraph Co.*, 291 F.3d 955 (7th Cir. 2002). As explained earlier, Johnson has failed to demonstrate that he has an actual or perceived disability within the meaning of the ADA. Thus, summary judgment is appropriate on his failure to accommodate claim.

## B. Johnson's Title VII Claim

Johnson devotes a mere half page to his claim of race discrimination under Title VII. Pl. Mem., p. 11. He first states in conclusory fashion that he has set forth a prima facie case. As with his disability discrimination claim, however, Johnson has not identified any similarly situated non-black employees who were treated better than him. *Logan v. Kautrex Textron North America*, 259 F.3d 635, 639-40 (7th Cir. 2001) (summary judgment proper where plaintiff failed to identify similarly situated employees of a different race who were treated more favorably). In addition, Johnson's only apparent evidence of pretext is the following:

> Plaintiff submits that defendant's treatment of plaintiff clearly was harassing and degrading. When that conduct is compared with the way defendant treated Mr. Lappin in his quest to return to work, such conduct can only be described as discriminatory based upon race.

Pl. Mem., p. 11. Again, Lappin is not similarly situated to Johnson so any comparison with him is both inappropriate and insufficient to establish pretext. Most importantly, Johnson has not presented any evidence that anyone at NSC requested medical examinations or placed him on medical hold because of his race. *See Holland v. Jefferson National Life Insurance Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989) (summary judgment is proper where the plaintiff presents no

22

indication of motive or intent in support of his position). Johnson's conclusory statements to the contrary cannot be the basis of a Title VII claim and NSC is entitled to summary judgment.

## CONCLUSION

For the reasons stated above, NSC's motion for summary judgment (Docket Entry #18-1) is granted. Johnson's motion for leave to file supplemental exhibit tab 6 (Docket Entry #26-1) is granted. Johnson's motion to strike certain paragraphs of the supplemental declaration of Dr. Lina (Docket Entry #28-1) is denied.

_Nan R. Nolan_
NAN R. NOLAN
United States Magistrate Judge

Dated: March 25, 2003